UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PERCEPTRON, INC.,

               Plaintiff,

                                             5:06-CV-0412
v.                                        (GTS/DEP)

SILICON VIDEO, INC.; and
PANAVISION IMAGING, INC.,

               Defendants.
_____

APPEARANCES:                              OF COUNSEL:

DeFRANCISCO & FALGIATANO LAW FIRM      JEAN M. WESTLAKE, ESQ.
  Counsel for Plaintiff
121 East Water Street
Syracuse, New York  13202

PINNISI & ANDERSON                   MICHAEL D. PINNISI, SR., ESQ.
  Counsel for Defendants
410 East Upland Road
Ithaca, New York 14850

HON. GLENN T. SUDDABY, United States District Judge

## MEMORANDUM-DECISION and ORDER

       Currently pending, in this breach-of-contract action filed by Perceptron, Inc. ("Plaintiff")

against Silicon Video, Inc., and Panavision Imaging, LLC ("Defendants"), are the following: (1)

Defendant Panavision Imaging, LLC's motion for summary judgment (Dkt. No. 111); (2)

Defendant Silicon Video, Inc.'s motion for summary judgment (Dkt. No. 114); (3) Plaintiff's

motion for summary judgment (Dkt. No. 134); and (4) Plaintiff's motion to dismiss Defendants'

affirmative defenses/counterclaims (Dkt. No. 110).  For the reasons set forth below, Defendant

Panavision Imaging, LLC's motion for summary judgment is granted; Defendant Silicon Video,

Inc.'s motion for summary judgment is denied; Plaintiff's motion for summary judgment is granted in part and denied in part; and Plaintiff's motion to dismiss Defendants' affirmative defenses/counterclaims is granted in part and denied in part as moot.

## I.   RELEVANT BACKGROUND

### A.   Plaintiff's Claims

Generally, in its Complaint, Plaintiff seeks a judgment declaring the rights of the parties with regard to the successor liability of Defendants for an arbitration award granted against non-party Photo Vision Systems, Inc. ("PVS") in favor of Plaintiff in the amount of $2,870,897.43 plus interest.  (*See generally* Dkt. No. 2, Attach. 1, at 8-15 [Plf.'s Compl.].)  More specifically, Plaintiff alleges that, after PVS breached a contract with Plaintiff in April 2002, but before Plaintiff obtained an arbitration award against PVS on March 24, 2004, PVS transferred its assets to Defendant Silicon Video, Inc. ("SVI"), which in turn transferred those assets to Defendant Panavision Imaging, LLC ("Panavision").  (*Id.*)

### B.   Defendants' Counterclaim

In their jointly-filed Answer, Defendants assert one affirmative defense/counterclaim to set aside the default arbitration award, "re-open" the arbitration, and permit any Defendant having successor liability for the default arbitration award the right to interpose a re-hearing of the arbitration, and present all available defenses, claims and counterclaims.  (Dkt. No. 17.)

### C.   Decision and Order of August 27, 2010

On March 22, 2007, Plaintiff filed its first motion for summary judgment.  (Dkt. No. 43.) On May 4, 2007, Defendant SVI and Defendant Panavision jointly filed a cross-motion for summary judgment.  (Dkt. No. 52.)  On August 27, 2010, this Court issued a Decision and Order

("August 2010 Order") denying Plaintiff's motion and Defendants' cross-motion for summary judgment without prejudice.  (Dkt. No. 61.)  In doing so, the Court concluded as follows: (1) "sufficient record evidence exists from which a rational factfinder could conclude that a genuine issue of material fact exists regarding whether Defendants are liable to Plaintiff for breach of contract under a '*de facto* merger' theory of successor liability"; (2) based on the then-current record, "a genuine issue of material fact exist[ed] regarding whether Defendants possessed sufficient knowledge of Plaintiff's claim when PVS's assets were transferred in March 2003." (*Id*.)  In addition, the Court rejected Defendants' other two arguments against successor liability (i.e., that Plaintiff did not experience a loss or reduction of its position following the transfer of PVS's assets to SVI, and the subsequent transfer of those assets to Defendant Panavision, and that, in transferring PVS's assets, Defendants followed the loan, security and statutory foreclosure process under New York Uniform Commercial Code § 9-620).  (*Id*.)

> **D.    Undisputed Material Facts on Parties' Current Motions**

Generally, the Court incorporates by reference the undisputed material facts set forth in the August 2010 Order to the extent those facts are not disputed by the record or the parties' current motions.  In addition, the Court treats as undisputed the material facts asserted by the parties on their current motions and either expressly or effectively admitted by the non-movants pursuant to Local Rule 7.1(a)(3).  (Dkt. No. 114 [Def. SVI's Rule 7.1 Statement]; Dkt. No. 116 [Def. Panavision's Rule 7.1 Statement]; Dkt. No. 135 [Plf.'s Rule 7.1 Statement]; Dkt. No. 159 [Plf.'s Rule 7.1 Response to Def. SVI's Rule 7.1 Statement]; Dkt. No. 179 [Plf.'s Rule 7.1 Response to Def. Panavision's Rule 7.1 Statement]; Dkt. No. 163 [Def. Panavision's Rule 7.1 Response to Plf.'s Rule 7.1 Statement]; Dkt. No. 165 [Def. SVI's Rule 7.1 Response to Plf.'s Rule 7.1 Statement].)  The following is a recitation of those undisputed material facts.

3

### 1.    PVS's Agreement with Plaintiff

PVS was founded in 1997 to develop advanced electronic designs and products.  In 1998, PVS entered into a License and Development Agreement with Plaintiff.  Between 1998 and 2002, Plaintiff paid PVS $550,400, pursuant to the License and Development Agreement, and in return received designs, prototypes, test data and other contract deliverables from PVS.  On April 17, 2002, Plaintiff sent a letter to Jeffrey Zarnowski, one of the founders of PVS, advising PVS that "it was terminating its contract with PVS because PVS had breached the contract."

On May 6, 2002, Plaintiff's CEO, Al Pease, sent a second letter to Jeffrey Zarnowski, reiterating Plaintiff's opinion that PVS had breached its contract with Plaintiff, and stating that Plaintiff had suffered substantial losses due to PVS's breach.  The letter further advised Jeffrey Zarnowski that, although Plaintiff would prefer to avoid costly litigation, Plaintiff's board had urged the company "to pursue recovery of our losses."  On May 20, 2002, Jeffrey Zarnowski acknowledged receipt of both the April 17 and May 6 letters.

On June 11, 2002, Pease sent a third letter to PVS's CEO, Thomas Vogelsong, demanding PVS's immediate return of the $550,440 already paid by Plaintiff to PVS under the License and Development Agreement.  Pease further advised that, "if the matter goes to arbitration and/or litigation [Plaintiff] will seek monetary damages that will include, in addition to the amounts already paid to PVS under the Agreement, more than $2.3 million in documented costs incurred by [Plaintiff] on the CMOS Imager Project as a direct result of promises made by PVS and subsequently wasted because of the failure of PVS to meet its contractual obligations."  The letter also advised that, "[i]f we do not achieve an amicable settlement on or before June 18, 2002, [Plaintiff] will have no choice but to pursue its legal remedies."

4

On June 24, 2002, Pease sent a letter to Vogelsong and Jeffrey Zarnowski, discussing a visit that occurred at Plaintiff's business on June 18, 2002, in which discussions were held about "solutions to avoid litigation."  On July 25, 2002, Zarnowski sent a letter to Pease, in which he stated as follows: "Upon acceptance of either PVS proposal, each party will exchange mutual general releases and neither party will have any rights, liabilities or obligations to the other under the Agreement, except for obligations arising under Sections 6 and 7 of the Agreement." Zarnowski further advised that, if no agreement was reached, "each party shall be entitled to pursue whatever rights and remedies it may have against the other."

## 2.      PVS's Loan from Lenders

At approximately this same time, in an effort to raise capital, PVS authorized the sale of preferred stock to its stockholders and potential investors.  The Cayuga Venture Fund, II, LLC ("CVF") conducted an independent due diligence inquiry about PVS that included review of PVS's financial statements, intellectual property, contracts, tangible assets, and other matters.  In that due diligence process, PVS disclosed its dispute with Plaintiff.

On September 23, 2002, PVS entered into a "Security Agreement" with CVF and certain other investors ("the Lenders"), pursuant to which PVS purported to grant the Lenders a first perfected security interest in all of PVS's assets, along with reserved rights to convert the debt to equity, in exchange for bridge loans through which PVS could borrow up to $1,750,000.  Three of the Lenders were PVS stockholders.  The loans were documented by promissory notes and security agreements; and UCC and U.S. Patent and Trademark notices were filed.

On December 2, 2002, Jennifer Tegan of CVF sent an email message to Thomas Vogelsong, in which she inquired about the "Current Status of the dispute with [Plaintiff]."  In a

response email message, Vogelsong indicated that Plaintiff "had notified PVS in April 2002 of their intent to terminate the License and Development Agreement due to delays in delivery of the ACS-1k product."  Vogelsong further acknowledged that PVS had been paid "approximately $520,000 for development work under the contract."

On February 25, 2003, CVF, on behalf of itself and the Lenders, issued a Notice of Default to PVS for failure to make payments in accordance with the Security Agreement.  In an email message sent to Thomas Vogelsong and Jeffrey Zarnowski on February 26, 2003, a CVF principal, David Ahlers, discussed the need to "develop a strategy to maximize the sales price [of PVS]."  In addition, Ahlers advised Vogelsong and Zarnowski about the "next steps for PVS," which involved a "creditors negotiation strategy" and "[f]rank and open discussion with all the players involved if we have any chance to pull this out of the fire."  In an email message sent to Vogelsong and Zarnowski on February 28, 2003, Ahlers expressed his opinion that there was "a realistic chance [of selling] a reconstituted PVS . . . to Pixim[,]" a third party.

On March 2, 2003, Vogelsong and Jeffrey Zarnowski prepared a "Business Strategy" document for Ahlers, Phil Projanski and Hank Watson, which provided a strategy to "Position [PVS] for Investment/Acquisition at Minimum Burn Rate."  The first sentence in the document stated as follows: "[g]iven our present condition, we must drastically reduce our expenses and maximize potential near term revenue, while preserving/creating a company which can attract the interest of investors or acquirers."

On March 6, 2003, Ahlers sent an email message to Projanski, Watson and Tegan, in which he stated that "a disaster [with regard to the sale of PVS] could easily effect our preferred employee relationships and the value of our security."  In addition, Ahlers stated in the email

message that he "feels [CVF is] caught between counsel's legal advice during this period and

sound business practice, where almost any action in line with one violates the other."  That same

day, PVS received notice from Plaintiff that it would file for arbitration "[i]f, within one week

from the date of this letter, [the parties did not] come to terms . . . acceptable for [Plaintiff] and

that g[a]ve [Plaintiff] confidence of continued support . . . ."

On March 11, 2003, Ahlers sent an email message to Tegan and Watson, with a subject

line entitled, "Clean start PVS – no creditor payments."  In the email message, Ahlers set forth

three scenarios for the future of PVS, all of which were premised on the assumption that "all

creditors are trashed."

On March 13, 2003, CVF provided a bridge loan to PVS to "meet payroll – maintain core

staff."  On March 15, 2003, CVF formed SVI.

### 3.      Transfer of Assets from PVS to SVI

On March 27, 2003, following PVS's default on its loan from the Lenders, PVS's assets

were transferred to Defendant SVI.  These assets included PVS's trademarks, copyrights,

goodwill, and accounts receivable.  Immediately upon the transfer, PVS ceased its ordinary

business.

Following the transfer, SVI set aside twenty-five percent (25%) of its stock for key

employees, certain critical creditors and SVI Board discretion.  In addition, SVI hired Jeffrey

Zarnowski to serve as the company's CEO, and provided him with a cash bonus, a salary, and

other benefits, including 9.92% ownership in the company, which made him the largest

individual shareholder.  SVI also hired Jeffrey Zarnowski's wife, Dawn Zarnowski, to serve as

the company's office manager, a role she had performed for PVS, and his brother, Terry

Zarnowski, to serve as the company's chief marketing officer.  SVI provided Dawn and Terry

cash, a salary, and other benefits, including company stock, of which Dawn received 0.10% and

Terry received 0.53%.  SVI hired four other former PVS employees, including Michael Joyner,

Ketan Karia, and Mike Sullivan.  In addition to their salaries, SVI provided Joyner 2.50% in

company, Karia 2.10% in company stock, and Sullivan 0.30% in company stock.  In addition,

SVI provided PVS's CEO, Thomas Vogelsong, capital stock in SVI.

Subsequently, certain companies that were owed money by PVS, including Plaintiff,

contacted SVI in an attempt to collect on PVS's obligations to them.  SVI advised these

companies that SVI would not pay PVS's debts.  However, SVI paid some vendors to whom

PVS owed money, in order to induce them to do business with SVI.[1]  In addition, the Lenders

invested a total $516,436 in Defendant SVI in order to keep Defendant SVI in business.

### 4.    Sale of SVI to Panavision, and Plaintiff's Arbitration Proceeding with PVS

Shortly after the transaction between PVS and SVI, the Lenders made efforts to find

purchasers for SVI.  SVI contacted various companies, including Panavision, regarding the

potential acquisition of SVI's assets.

On July 2, 2003, Panavision executed a Mutual Non-Disclosure Agreement with SVI in

order to obtain more information about the assets for sale.  Subsequently, Panavision conducted

due diligence into the possible acquisition of the CMOS image technology and other assets

owned by SVI.

---

[1]    The parties dispute whether the payment was (1) an up-front cash incentive for future services, or (2) made in satisfaction of PVS debt.  (*Compare* Dkt. No. 114, Rule 7.1 Statement, at ¶ 81 *with* Dkt. No. 159, Rule 7.1 Response, at ¶ 81.)

On July 8, 2003, Plaintiff filed a demand for arbitration regarding PVS's alleged breach of contract.  Plaintiff served the demands on PVS and SVI, contending that PVS had breached and SVI had successor liability for the breach.  PVS did not respond to the arbitration demand. At some point between August 7 and 20, 2003, SVI objected to the demand on the ground that it was not a party to the contract, and threatened to seek a stay of arbitration.  On or about August 20, 2003, Plaintiff voluntarily discontinued the arbitration against SVI.

On or about October 2, 2003, Panavision made an initial written offer to purchase the assets of SVI.  On October 8, 2003, Panavision made a revised written offer.  The revised written offer proposed a transaction in the form of an asset purchase and consisted essentially of a $2,000,000 purchase price plus an "earn-out" of not less than $500,000 based on future revenues generated from assets after the closing of the transaction.

On October 10, 2003, SVI accepted Panavision's purchase offer.  Panavision then conducted a thorough due diligence of SVI's assets.  Panavision provided SVI with a document request list.  Panavision's requests sought information about, among other things, SVI's assets, intellectual property, contracts, licenses and customers, as well as SVI's predecessor, PVS, and the foreclosure transaction.  Subsequently, SVI set up a "data room" filled with documents and information for review by Panavision and its attorneys.  Eric Golden, then Senior Vice President of Panavision, went to Homer, New York, on October 21, 2003.  For two days, Golden personally reviewed information in the data room, and conducted meetings with SVI personnel. At some point at or around the time of these meetings, SVI personnel informed Golden that Plaintiff had commenced an arbitration proceeding against PVS and SVI in July 2003, and that SVI had been dismissed from that arbitration proceeding without prejudice.  In addition, SVI

9

personnel provided Golden with documents relating to the foreclosure, Plaintiff, and the arbitration proceeding in the data room.

While SVI was in negotiations with Panavision, Plaintiff proceeded with its arbitration proceeding against PVS.

On December 15, 2003, Panavision purchased substantially all of the assets of SVI pursuant to a written asset purchase agreement.  In exchange for its assets, SVI received a cash payment of approximately $2,000,000, with an opportunity for no less than $500,000 of additional consideration over the next several years in the form of earn-out payments. Panavision did not contractually assume any liabilities of either SVI or PVS with respect to Plaintiff.  After the completion of the asset purchase, certain employees of SVI went to work for Panavision, including Jeffrey Zarnowski (who was hired as a member of Panavision's management team), and Dawn Zarnowski (who was hired as an office manager).

Following the asset purchase, SVI ceased regular operations, but continued to receive "earnout" payments for several years.  PVS formally dissolved in December 2003.

On March 24, 2004, the arbitrator issued an award in favor of Plaintiff in the full amount claimed of $2,870,897.43.  Subsequently, Plaintiff filed a Complaint for Entry of Judgment Based Upon Arbitration Award against PVS in Wayne County Circuit Court, and a motion to confirm the award and enter judgment in Plaintiff's favor, which was granted.

    **E.**    **Summary of Parties' Motions**

        **1.**    **Defendant Panavision's Motion for Summary Judgment**

Generally, in support of its motion for summary judgment, Defendant Panavision argues that Plaintiff's claim of successor liability should be dismissed because a rational factfinder could, based on the evidence in the record, conclude only that (1) it did not expressly or

impliedly assume SVI's or PVS's liabilities, (2) a "*de facto* merger" did not occur, and (3) its purchase of SVI's assets was not fraudulent.  (Dkt. No. 116.)

Generally, in response, Plaintiff argues, *inter alia*, that Defendant Panavision's motion should be denied because (1) it relies on the same arguments already rejected by the Court in its August 2010 Order (and therefore constitutes an improper improper re-filing of its first motion for summary judgment pursuant to the law-of-the-case doctrine), and (2) the evidence in the record establishes that Defendant Panavision (a) knew about Plaintiff's breach-of-contract claim before its acquisition of SVI, and (b) is the successor in interest to PVS/SVI under the *de facto* merger theory.  (Dkt. No. 179.)

Generally, in its reply, in addition to reiterating previously advanced arguments, Defendant Panavision argues that its motion is properly before the Court, and that the law-of-the-case doctrine is inapplicable.  (Dkt. No. 171.)

### 2.      Defendant SVI's Motion for Summary Judgment

Generally, in support of its motion for summary judgment, Defendant SVI argues that Plaintiff's claim of successor liability should be dismissed because a rational factfinder could, based on the evidence in the record, conclude only that (1) SVI did not merge with or continue PVS to avoid liability, (2) there was no fraudulent conveyance to or by SVI, and (3) public policy does not support a finding of successor liability in this case.  (Dkt. No. 114.)

Generally, in response, Plaintiff argues, *inter alia*, that Defendant SVI's motion should be denied because (1) it relies on the same arguments already rejected by the Court in the August 2010 Order (and therefore constitutes an improper re-filing of its first motion for summary judgment pursuant to the law-of-the-case doctrine), and (2) the evidence in the record establishes that Defendant SVI (a) knew about Plaintiff's breach-of-contract claim before its acquisition of

PVS, and (b) is the successor in interest to PVS under the *de facto*-merger theory.  (Dkt. No. 158.)

Generally, in its reply, in addition to reiterating previously advanced arguments, Defendant SVI argues that its motion is properly before the Court, and that the law-of-the-case doctrine is inapplicable.  (Dkt. No. 173.)

### 3.   Plaintiff's Motion for Summary Judgment

Generally, in support of its motion for summary judgment, Plaintiff argues that the amplified record establishes that there is no genuine issue of material fact that Defendants SVI and Panavision (1) had sufficient knowledge of Plaintiff's claims as to render them liable under the fraudulent transaction theory of successor liability, and (2) are the successors in interest to PVS under the *de facto*-merger theory of successor liability.  (Dkt. No. 134.)

Generally, in its response, Defendant Panavision argues that Plaintiff's motion for summary judgment should be denied because there is no evidence in the record from which a rational factfinder could conclude that (1) a "*de facto* merger" between Defendant SVI and Defendant Panavision occurred, or (2) Defendant Panavision purchased Defendant SVI's assets to fraudulently escape an obligation to Plaintiff.  (Dkt. No. 163.)

Similarly, Defendant SVI argues in its response that Plaintiff's motion for summary judgment should be denied because there is no evidence in the record from which a rational factfinder could conclude that (1) SVI merged with or continued PVS, or (2) there was a fraudulent conveyance to or by SVI.  (Dkt. No. 165.)

In its reply, Plaintiff essentially reiterates its previously advanced arguments.  (Dkt. No. 175.)

4. **Plaintiff's Motion to Dismiss Defendants' Affirmative Defense/Counterclaim**

Generally, in support of its motion to dismiss this affirmative defense and/or counterclaim, Plaintiff argues that the affirmative defense and/or counterclaim is (1) meritless, (2) barred by the statute of limitations, and (3) barred by the doctrines of collateral estoppel and *res judicata*.  (Dkt. No. 110.)

Generally, in their response, Defendants argue that the affirmative defense and/or counterclaim (1) has merit, (2) is not barred by the statute of limitations, and (3) is not barred by the doctrines of collateral estoppel and *res judicata*.  (Dkt. Nos. 148, 155.)[2]

In its reply, Plaintiff essentially reiterates its previously advanced arguments.  (Dkt. No. 168.)

## II.   RELEVANT LEGAL STANDARDS

### A.   Standard Governing Motions for Summary Judgment

Because the Court recited the legal standard governing motions for summary judgment in the August 2010 Order,[3] the Court will not recite that well-known legal standard in this Decision and Order.  Rather, the Court refers the parties to the August 2010 Order.

### B.   Standard Governing Dismissal of Affirmative Defenses/Counterclaims

"The standard on a motion to dismiss also applies to a motion to dismiss a counterclaim pursuant to [Fed. R. Civ. P.] 12(b)(6) and a motion to strike an affirmative defense pursuant to

---

[2]      In addition, Defendant SVI argues that Plaintiff's successor liability claim is barred by the doctrine of judicial estoppel.  (Dkt. No. 155.)  However, this argument should have been filed in Defendant SVI's motion for summary judgment, or in its opposition to Plaintiff's motion for summary judgment.  As a result, the Court declines to consider this argument in this Decision and Order.

[3]      (Dkt. No. 61.)

13

[Fed. R. Civ. P.] 12(f)."  *Aspex Eyewear, Inc. v. Clariti Eyewear, Inc.*, 531 F. Supp.2d 620, 622

(S.D.N.Y. 2008) (citing *FSP, Inc. v. Societe Generale*, 02-CV-4786, 2005 WL 475986, at *7-8

[S.D.N.Y. Feb. 28, 2005]).  For the sake of brevity, the Court will not recite, in this Decision and

Order, the well-known legal standard governing dismissals for failure to state a claim pursuant to

Fed. R. Civ. P. 12(b)(6), but will direct the reader to the Court's decision in *Wade v. Tiffin*

*Motorhomes, Inc.*, 05-CV-1458, 2009 WL 3629674, at *3-5 (N.D.N.Y. Oct. 27, 2009) (Suddaby,

J.).

      **C.**      **General Legal Standard Governing Plaintiff's Claim of Successor Liability**

      Because this Decision and Order is issued primarily for the benefit of the parties to this

action, and because those parties have demonstrated a sufficient understanding of the general

legal standard governing Plaintiff's claim of successor liability for breach of contract, the Court

will not repeat that legal standard in its entirety in this Decision and Order, but will merely refer

the parties to the relevant portions of their memoranda of law.  (*See generally* Dkt. Nos. 114,

116, 134.)

**III.**      **ANALYSIS**

      **A.**      **Plaintiff's *De Facto*-Merger Theory of Successor Liability**

      For a "*de facto* merger" to occur, there must be continuity of the successor and

predecessor corporation as evidenced by the following four factors: "(1) continuity of ownership;

(2) a cessation of ordinary business and dissolution of the predecessor as soon as practically and

legally possible; (3) assumption by the successor of the liabilities ordinarily necessary for the

uninterrupted continuation of the business of the predecessor; and (4) a continuity of

management, personnel, physical location, assets, and general business operation."  *Lumbard v.*

*Maglia, Inc.*, 621 F. Supp. 1529, 1535 (S.D.N.Y. 1985).  "Not all of these factors are needed to

demonstrate a merger; rather, these factors are only indicators that tend to show a *de facto*

merger." *Lumbard*, 621 F. Supp. at 1535 (internal quotation marks omitted).

### 1.    Plaintiff's Claim Against Defendant SVI

In its August 2010 Order, the Court concluded that "sufficient record evidence exists

from which a rational factfinder could conclude that a genuine issue of material fact exists

regarding whether Defendants are liable to Plaintiff for breach of contract under a '*de facto*

merger' theory of successor liability."  (Dkt. No. 61.)  The Court based this conclusion on its

finding that both Plaintiff and Defendants had adduced admissible record evidence in support of

their arguments.  With regard to Defendant SVI, such record evidence included the following:

(1) the Declaration of David Ahlers, asserting that Defendant SVI told creditors that it would

not, and did not, assume the liabilities of PVS (Dkt. No. 52, Ahlers Decl., at ¶ 30); (2) the

Declaration of David Ahlers, asserting that each Lender's ownership of Defendant SVI was

proportionate to, and based solely upon, the amount of that Lender's loan to PVS (Dkt. No. 52,

Ahlers Decl., at ¶¶ 16-17); and (3) the Declaration of David Ahlers, showing that the total

ownership overlap between PVS and Defendant SVI was under 3.5%, and that none of the

holders of the remaining 95.6% of PVS received stock of Defendant SVI, in the foreclosure

(Dkt. No. 52, Ahlers Decl., at ¶¶ 18-19).

However, based on the record evidence currently before the Court, it is undisputed that

PVS ceased its ordinary business immediately upon its transfer of assets to Defendant SVI on

March 27, 2003, and that it formally dissolved approximately nine months later (i.e., in

December 2003).  This undisputed material fact weighs in favor of finding that there was a

cessation of ordinary business and dissolution of PVS as soon as practically and legally possible

(satisfying the second of the four above-described factors).[4]

Moreover, based on the record evidence currently before the Court, it is undisputed that Defendant SVI paid certain of PVS's creditors in order to induce them to do business with Defendant SVI.  This undisputed material fact weighs in favor of finding that Defendant SVI assumed the liabilities of PVS necessary for the uninterrupted continuation of the business of PVS (satisfying the third of the four above-described factors).

In addition, based on the record evidence currently before the Court, it is undisputed that Defendant SVI continued to operate out of the same physical location as PVS, hired "all IP and key personnel" from PVS, including one of the founders and his wife and brother, and retained PVS's assets, which were subsequently sold to Defendant Panavision.  This undisputed material fact weighs in favor of finding that there was continuity of management, personnel, physical location, assets, and general business operation between PVS and Defendant SVI (satisfying the fourth of the four above-described factors)

In addition, based on record evidence currently before the Court, it is undisputed that (1) Jeffrey Zarnowski, one of the founders of PVS who became CEO of Defendant SVI shortly after the transfer of PVS's assets to Defendant SVI, received 9.92% ownership in Defendant SVI when he was named CEO, and (2) six other former employees of PVS received stock in Defendant SVI shortly after the transfer of PVS's assets to Defendant SVI in a total amount of

---

[4]      *See AT & S Transp., LLC v. Odyssey Logistics & Technology Corp.*, 22 A.D.3d 750, 753 (N.Y. App. Div. Dept., 2005) (noting that, "[s]o long as the acquired corporation is shorn of its assets and has become, in essence, a shell, legal dissolution is not necessary before a finding of a *de facto* merger will be made"); *Knapp v. N. Am. Rockwell Corp.*, 506 F.2d 361, 367 (3d Cir. 1974), *cert. denied*, 421 U.S. 965 (1975) (finding that a *de facto* merger had occurred even though the selling corporation was not dissolved until eighteen months after the sale and possessed valuable assets during the interim).

8.93%.[5]  This undisputed material fact weighs in favor of finding that there was continuity of between PVS and Defendant SVI (weighing in favor of finding that the first of the four above-described factors has been satisfied).

However, there is a genuine dispute, based on the record evidence currently before the Court, as to whether the Lenders agreed to provide some or all of these PVS employees with an ownership interest in Defendant SVI as part of the agreement to transfer PVS's assets to Defendant SVI.  (For example, the Court notes that the transfer of ownership did not occur until, at the earliest, eleven days after the transfer of assets.)[6]  Such a genuine dispute of fact is material to finding a continuity of ownership between PVS and Defendant SVI.  Thus, while all the events constituting a *de facto* merger need not occur at the same time,[7] at least one district court in this Circuit has recognized that ownership of a successor indicates a *continuity* of ownership (between a predecessor and a successor) only if ownership of the successor was part

_____

[5]        Thomas Vogelsong received two checks totaling $57,789 for his "capital stock" in Defendant SVI once the company was sold to Defendant Panavision.  Jeffrey Zarnowski, who owned 9.92% of Defendant SVI, received a check for $168,614.  The Court notes that $57,789 divided by $168,614 equals approximately .3427, and 34.27% of 9.92% equals approximately 3.40%.  As a result, it appears from the record evidence that Thomas Vogelsong owned 3.40% of Defendant SVI.  Dawn Zarnowski, Terry Zarnowski, Michael Joyner, Ketan Karia, and Mike Sullivan received a total of 5.53% ownership in Defendant SVI.  The Court notes that 5.53% plus 3.40% equals 8.93%.

[6]        The record evidence establishes that each former PVS employee who was awarded stock in Defendant SVI was given the stock in a letter dated April 11, 2003, as part of the compensation offered for employment with Defendant SVI that commenced on April 7, 2003.  (Dkt. No. 135, Exh. 47, 51.)

[7]        *Arnold Graphics Indus., Inc. v. Independent Agent Ctr., Inc.*, 775 F.2d 38, 42 (2d Cir. 1985) ("[T]here is no requirement that all of the events that are necessary to a finding of *de facto* merger occur at the same time.").

of the agreement to transfer assets from the predecessor to the successor.[8]   As a result, while the

Court finds that providing certain PVS employees with at least eighteen percent (18%)

ownership in Defendant SVI could be enough to establish continuity of ownership,[9] the Court

finds that a genuine issue of material fact remains regarding whether the Lenders provided PVS

employees with stock as part of the asset purchase, sufficient to create a continuity of ownership.

Simply stated, while three of the four factors identified in *Lumbard* weigh in favor of

finding a *de facto* merger, the first factor is sufficiently disputed to preclude the Court from

concluding, as a matter of law, that a *de facto* merger has occurred.  The Court notes that,

because this first factor is essential, it *must* be shown.[10]

---

[8]        *Desclafani v. Pave-Mark Corp.*, 07-CV-4639, 2008 WL 3914881, at *5 (S.D.N.Y.
Aug. 22, 2008) (rejecting argument "that there is an issue of fact concerning continuity of
ownership because, [although] as part of the deal between Pave-Mark and Stimsonite, Stimsonite
hired Finley[, one of the majority shareholders of the acquired company,] as an executive officer,
paid him [not pursuant to the deal but] pursuant to a Pave-Mark bonus plan that Stimsonite
assumed under the APA, and, subsequently [approximately one year later], granted him
Stimsonite stock options[,]" noting that plaintiff failed to adduce evidence establishing "that
Finely received an ownership interest in Stimsonite–whether stock or stock options–as part of
the asset purchase"); *see also In re New York City Asbestos Litigation*, 789 N.Y.S.2d 484, 486-
87 (N.Y. App. Div., 1st Dept., 2005) ("The first criterion, continuity of ownership, exists where
the shareholders of the predecessor corporation become direct or indirect shareholders of the
successor corporation as the result of the successor's purchase of the predecessor's assets, as
occurs in a stock-for-assets transaction. Stated otherwise, continuity of ownership describes a
situation where the parties to the transaction become owners together of what formerly belonged
to each.") (internal quotation marks and citation omitted).

[9]        *See Glynwed, Inc. v. Plastimatic, Inc.*, 869 F. Supp. 265, 276-77 (D. N.J. 1994)
(finding sufficient ownership continuity where three minority shareholders of predecessor were
also shareholders of successor); *Allen Morris Commercial Real Estate Serv. Co. v. Numismatic
Collectors Guild, Inc.*, 90-CV-0264, 1993 WL 183771, at *2, 6 (S.D.N.Y. May 27, 1993)
(finding continuity of ownership where three equal shareholders converted 100% ownership of
predecessor company to 40% ownership of successor, with remaining 60% owned by unrelated
investment holding company); *cf. Lumbard v. Maglia, Inc.*, 621 F. Supp. 1529, 1535 (S.D.N.Y.
1985) ("[T]he cases uniformly hold that continuity, not uniformity, is the significant variable.").

[10]        *See Priestley v. Headminder, Inc.*, 647 F.3d 497, 505-06 (2d Cir. 2011)
("Although the court examines all of the foregoing factors, continuity of ownership is the

For this reason, the Court denies both Plaintiff's motion for summary judgment and Defendant SVI's motion for summary judgment to the extent that the motions are premised on the absence of a genuine issue of material fact regarding the *de facto*-merger theory of successor liability.

### 2.    Plaintiff's Claim Against Defendant Panavision

It is undisputed that certain former employees of Defendant SVI were hired by Defendant Panavision to perform substantially the same duties as they performed as employees of Defendant SVI (and PVS).  However, it is also undisputed that Defendant Panavision paid Defendant SVI $2,000,000 *in cash* for its assets.  Such a cash payment precludes a finding that there was a continuity of ownership between Defendant SVI and Defendant Panavasion (which is a requirement for a finding of a *de facto* merger, under the test articulated in *Lumbard*).[11]

---

essence of a merger, . . . and the doctrine of de facto merger cannot apply in its absence.") [internal quotation marks and citation omitted]; *Miller v. Forge Mench P'ship Ltd.*, 00-CV-4314, 2005 WL 267551, at *8 (S.D.N.Y. Feb. 2, 2005) ("Although the Second Circuit has recently declined to decide whether all four factors in the *de facto* merger test must be met . . . the Court has affirmed that 'continuity of ownership' is the 'essence' of a *de facto* merger and therefore must be shown.") [quoting *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 46-47 (2d Cir. 2003)].

[11]      *See Desclafani*, 2008 WL 3914881, at *5; *Peralta v. WHM Tool Group, Inc.*, 04-CV-3826, 2005 WL 2002454 at *3 (E.D.N.Y. Aug. 15, 2005) ("Such continuity [of ownership] does not exist in this case since the successor corporation purchased assets with cash [and] the shareholders of DeVrieg-Bullard did not become shareholders in Powermatic Corporation or ultimately shareholders in WHM."); *Conn. Indem. Co. v. 21st Century Transp. Co., Inc.*, 99-CV-7735, 2001 WL 868340, at *6 (E.D.N.Y. July 27, 2001) ("[T]here is no continuity of ownership between Rutigliano and Allied, as evidenced by the fact that Rutigliano shareholders did not become Allied shareholders as a result of the purchase, since Allied purchased Rutigliano for cash."); *In re New York City Asbestos Litig.*, 15 A.D.3d 254, 256 (N.Y. App. Div., 1st Dept. 2005) (finding "no continuity of ownership between Old H-T and New H-T, since New H-T paid for Old H-T's assets with cash, not with its own stock, and neither Old H-T nor any of its shareholders has become a shareholder of New H-T").

As a result, Plaintiff's motion for summary judgment on its claim of successor liability under a *de facto*-merger theory against Defendant Panavision is denied, and Defendant Panavision's motion for summary judgment on this claim is granted.

### B.      Plaintiff's Fraudulent-Transaction Theory of Successor Liability

Before turning to an analysis of the merits of Plaintiff's fraudulent-transaction theory of successor liability, the Court pauses to note that Plaintiff has standing to bring this claim.  This is because the record evidence clearly establishes as follows: (1) on March 27, 2003, PVS owed the Lenders $1,620,000;[12] (2) the Lenders released their claims against PVS in exchange for PVS's assets, which were transferred to them; (3) the Lenders then transferred PVS's assets to Defendant SVI; (4) subsequently the Lenders invested $516,436 in Defendant SVI; (5) on December 15, 2003, Defendant Panavision acquired Defendant SVI for at least $2,500,000 (specifically $2,000,000 in cash plus the opportunity for no less than $500,000 of additional consideration over the next several years in the form of earn-out payments); and (6) Plaintiff's breach-of-contract claim against PVS is for $550,400 plus interest.

In other words, as discussed in more detail below in Part III.B.1. of this Decision and Order, there is undisputed evidence in the record that PVS's assets were worth more than the $1,620,000 debt that the Lenders agreed to release in exchange for PVS's assets.[13]  Thus, there is

---

[12]      The Court notes that, although there is some evidence in the record that the loan amount was $1,686,300 (Dkt. No. 135, Exh. 48, at 2, 6), the transfer agreement establishes that the loan amount that the Lenders forgave in exchange for PVS's assets was $1,620,000 (Dkt. No. 116, Exh. 9).

[13]      Specifically, the Court finds that PVS's assets were worth at least $363,564.00 more than what Defendant SVI paid for those assets on March 27, 2003.  The Court reaches this conclusion based on the following calculations: (1) $1,620,000.00 of initial debt forgiveness plus $516,436.00 in additional investment equals $2,136,436.00 in total investment in PVS by the Lenders; and (2) at least $2,500,000.00 in consideration received for PVS minus $2,136,436.00 in total investment in PVS equals at least $363,564.00 in PVS assets available (beyond the

undisputed evidence in the record that, had the transfer of PVS's assets to Defendant SVI not

occurred, there would have been assets available to satisfy a portion, if not all, of the debt owed

to Plaintiff.[14]

Turning to the legal standard governing the fraudulent-transaction theory of successor

liability, "New York's Uniform Fraudulent Conveyance Act ("UFCA"), N.Y. Debtor and

Creditor Law §§ 270-81 (McKinney 2001), provides remedies for both constructive fraud and

actual fraud." *Capital Distrib. Servs., Ltd. v. Ducor Exp. Airlines, Inc*., 440 F. Supp.2d 195, 203

(E.D.N.Y. 2006). "Under the statute, if a conveyance is made without fair consideration and the

transferor is a debtor who is insolvent or will be rendered insolvent by the transfer, the

conveyance is deemed constructively fraudulent." *Capital Distrib. Servs., Ltd.*, 440 F. Supp.2d

---

amount paid through debt forgiveness) on March 27,2003. The Court notes that, according to
Defendant SVI's Rule 7.1 Statement, Defendant SVI's initial debt forgiveness was
$1,*635*,000.00. (Dkt. No. 114, Def. SVI's Rule 7.1 Stmt, at ¶ 53) [emphasis added].
Furthermore, according to Defendant SVI's Rule 7.1 Statement, Defendant SVI's total
investment in PVS was $2,*151*,436.00 (equaling 1,635,000.00 of initial debt forgiveness plus
$516,436.00 in additional investment). (*Id*. at ¶ 84 [emphasis added].) If established, these
factual assertions would reduce the amount of PVS assets available on March 27, 2003 (beyond
the amount paid through debt forgiveness) to $3*48*,564.00 (equaling the difference between
$2,500,000.00 in consideration received for PVS minus $2,151,436.00 in total investment in
PVS). However, based on the fact that the transfer agreement between PVS and the Lenders
expressly states that the value of the debt forgiven by the Lenders in exchange for PVS's assets
is $1,620,000.00 (and based on the conclusory and uncorroborated nature of the record evidence
offered in support of the $1,635,000.00 figure, *see* Ahler's Decl., at ¶ 12, and Teegan Decl. at ¶
29), the Court finds $1,620,000.00 to be the amount that the Lenders forgave in debt in exchange
for PVS's assets.

[14]      *Cf. Miller*, 2005 WL 267551, at *4 ("Because a creditor's remedy in a fraudulent
conveyance action is limited to reaching the property which would have been available to satisfy
the judgment had there been no conveyance, . . . a complaining creditor must first demonstrate
that it had an equity stake in the debtor's assets–that is, that some portion of the debtor's assets
would have been available to satisfy the unsecured creditor's claims had there been no
conveyance. . . . Absent any such equity in the assets conveyed, an unsecured creditor lacks
standing to challenge the conveyance as fraudulent.") (internal quotation marks and citations
omitted).

at 203 (citing N.Y. Debtor and Creditor Law § 273).  "In general, the party challenging the

conveyance has the burden of proving both insolvency and the lack of fair consideration."  *Id*.

"If the conveyance is found lacking in consideration, the burden also shifts to the transferee to

prove continued solvency after the transaction."  *Id*.

  "If a conveyance is made with actual intent to hinder, delay, or defraud either present or

future creditors, then it is deemed actually fraudulent."  *Id*. at 203-04 (citing N.Y. Debtor and

Creditor Law § 276).  "Actual intent need not be proven by direct evidence, but may be inferred

from the circumstances surrounding the allegedly fraudulent transfer."  *Id*. at 204.  "In

determining whether a conveyance was fraudulent, courts will consider 'badges of fraud,' which

are circumstances that accompany fraudulent transfers so commonly that their presence gives

rise to an inference of intent."  *Id*.  "Badges of fraud include (1) the close relationship among the

parties to the transaction, (2) the inadequacy of the consideration, (3) the transferor's knowledge

of the creditor's claims, or claims so likely to arise as to be certain, and the transferor's inability

to pay them, and (4) the retention of control of property by the transferor after the conveyance."

*Dempster v. Overview Equities, Inc*., 4 A.D.3d 495, 498 (N.Y. App. Div., 2d Dept. 2004); *see

also MFS/Sun Life Trust v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 934-35 (S.D.N.Y.

1995) (noting that fraudulent conveyance may be established by proving "actual intent" to

defraud present or future creditors, which is evidenced by "badges of fraud" that "give[] rise to

an inference of intent").

  "Generally, the creditor's remedy in a fraudulent conveyance action is limited to reaching

the property which would have been available to satisfy the judgment had there been no

conveyance."  *Capital Distrib. Servs., Ltd.*, 440 F. Supp.2d at 204.  "However, where the assets

fraudulently transferred no longer exist or are no longer in the possession of the transferee, a

money judgment may be entered against the transferee in an amount up to the value of the fraudulently transferred assets." *Id.*

### 1.    Plaintiff's Claim Against Defendant SVI

In the August 2010 Order, although the Court found that Defendants failed to "squarely address Plaintiff's fraudulent-transaction theory of successor liability," the Court concluded that, based on the then-current record, "a genuine issue of material fact exist[ed] regarding whether Defendants possessed sufficient knowledge of Plaintiff's claim when PVS's assets were transferred in March 2003." (Dkt. No. 61.)  The Court based its conclusion on its finding that Plaintiff and Defendants had adduced record evidence in support of their arguments, and that neither party provided the Court with (1) a description of the communication between Plaintiff and PVS in July 2002, or (2) a copy of the April 2002 notice of termination of contract issued by Plaintiff to PVS.  (*Id.*)

However, based on the current record, the Court finds that a rational factfinder could conclude only that Defendant SVI (which was majority-owned and controlled by the Lenders, and which was run by PVS's founder, Jeffrey Zarnowski) had knowledge of Plaintiff's breach-of-contract claim against PVS before the time when PVS's assets were transferred to Defendant SVI on March 27, 2003.  The Court reaches this conclusion based on the following undisputed material facts: (1) on May 2, 2002, Jeffrey Zarnowski acknowledged receipt of Plaintiff's Notice of Termination letter, which requested that PVS repay Plaintiff the $550,440 that had been paid to PVS by Plaintiff; (2) on May 6, 2002, Jeffrey Zarnowski received an additional demand letter from Plaintiff, which indicated that Plaintiff sought the return of the $550,440 that had been paid to PVS by Plaintiff; (3) on or about June 11, 2002, Thomas Vogelsong received an additional demand letter from Plaintiff, which indicated that Plaintiff sought the return of the $550,440 that

had been paid to PVS by Plaintiff; (4) on June 18, 2002, Thomas Vogelsong and Jeffrey

Zarnowski met with Plaintiff's representatives to discuss "solutions to avoid litigation"; (5)

sometime before September 23, 2002, during CVF's due diligence of PVS, PVS disclosed its

dispute with Plaintiff; (6) on December 2, 2002, Jennifer Tegan of CVF sent an email message to

Thomas Vogelsong, in which she inquired about the "Current Status of the dispute with

[Plaintiff]"; (7) in a response email message, Vogelsong indicated that Plaintiff "had notified

PVS in April 2002 of their intent to terminate the License and Development Agreement due to

delays in delivery of the ACS-1k product[,]" and that PVS had been paid "approximately

$520,000 for development work under the contract"; (8) on March 6, 2003, after CVF notified

PVS that it was in default, Thomas Vogelsong received notice from Plaintiff that it would file for

arbitration "[i]f, within one week from the date of this letter, [the parties did not] come to terms .

. . acceptable for [Plaintiff] and that g[a]ve [Plaintiff] confidence of continued support"; (9) on

March 27, 2003, Thomas Vogelsong signed the agreement that transferred PVS's assets to

Defendant SVI on behalf of PVS; and (10) Jeffrey Zarnowski became CEO of Defendant SVI on

or about April 7, 2003, received 9.92% ownership in Defendant SVI.

In addition, the Court finds that, based on Plaintiff's letter submitted to Thomas

Vogelsong on March 6, 2007, a rational factfinder could conclude only that PVS and Defendant

SVI had knowledge, on March 27, 2003, that Plaintiff's claims were "so likely to arise as to be

certain." *Pen Pak Corp. v. LaSalle Nat. Bank of Chicago*, 658 N.Y.S.2d 407, 408 (N.Y. App.

Div., 2d Dept. 1997).  Liability for a fraudulent transaction may be imposed on this basis. *See

Pen Pak Corp.*, 658 N.Y.S.2d at 408 (noting that liability for a fraudulent transaction may be

imposed, setting aside the presence of other "badges of fraud," if there exists "the transferor's

knowledge of a creditor's claims, or claims so likely to arise to be certain, and the transferor's

inability to pay them").

Moreover, there exists in the record evidence of other "badges of fraud," which further satisfy Plaintiff's burden of establishing an actual intent to defraud.  First, a close relationship existed between certain stockholders of PVS and the Lenders (who owned the majority of Defendant SVI), as evidenced by the Lenders setting aside a percentage of Defendant SVI's stock for key former PVS employees, and awarding 9.92% of the company's stock to Jeffrey Zarnowski.  Moreover, at the time PVS's assets were transferred to Defendant SVI, a more-than-close relationship existed between the parties to the transaction–they were, for all intents and purposes, one and the same.  The Court reaches this conclusion based on the following undisputed material facts: (1) the Lenders, through the Security Agreement, had ownership rights to PVS's assets in the event of a default; (2) CVF, on behalf of itself and the other Lenders, issued a Notice of Default to PVS on February 25, 2003; (3) members of CVF had internal discussions, before "owning" PVS, about "trash[ing]" PVS's creditors and; (4) CVF's principle, David Ahlers, had discussions with Jeffrey Zarnowski and Thomas Vogelsong about selling "a reconstituted PVS" only three days after the Lenders issued a Notice of Default to PVS; (5) on March 2, 2003, Vogelsong and Jeffrey Zarnowski prepared a "Business Strategy" document for Ahlers, Phil Projanski and Hank Watson, which provided a strategy to "Position [PVS] for Investment/Acquisition at Minimum Burn Rate"; (6) on March 27, 2003, CVF and the Lenders released their claims against PVS in exchange for PVS's assets; and (7) the Lenders, and not PVS stockholders, transferred PVS's assets to Defendant SVI.

Second, the Lenders, who had discussions about selling PVS's assets before owning them, retained control of PVS's assets after the conveyance.  *See U.S. v. Coppola*, 85 F.3d 1015, 1022 (2d Cir. 1996) ("[D]espite the foreclosure sales, James Jr. never relinquished possession of either the equipment or the property.  [In addition,] James Jr. managed to raise over $400,000 for the repurchase of the equipment only a few months after its foreclosure and . . . he sought

25

financing for the 'repurchase' of the Strickland Property even before the execution sale of that property occurred. . . .  In short, the record supports the district court's findings and conclusions that the various transfers and conveyances, viewed as a single scheme, served to hinder, delay, and defraud the United States in its efforts to collect the estate's unpaid taxes.").

Under these circumstances, a rational factfinder could conclude only that PVS's assets were fraudulently conveyed to Defendant SVI for the purpose of PVS avoiding having to pay certain of its outstanding debt (which would have decreased PVS's value to the Lenders). Moreover, Defendant SVI has failed to adduce admissible record evidence controverting the inference of an intent to defraud drawn from these "badges of fraud."  Rather, Defendant SVI argues that the conveyance cannot be deemed fraudulent because PVS's owners did not retain the benefit of the assets after the transfer.  However, before the transfer, PVS was insolvent.  In other words, the PVS shareholders had lost the benefit of PVS's assets *before* the transfer. Moreover, after the transfer, certain former PVS shareholders were awarded shares of Defendant SVI.  Finally, Defendant SVI's argument fails to recognize that, at the time of the transfer of PVS's assets, the Lenders were the legal owners of PVS.[15]

As a result, Plaintiff's motion for summary judgment on its claim of successor liability under a theory of fraudulent conveyance against Defendant SVI is granted, and Defendant SVI's motion for summary judgment on this claim is denied.

In the alternative, the Court finds that Plaintiff has established the elements of a constructively fraudulent conveyance under § 275 of New York Debtor and Creditor Law.  "To prove a constructively fraudulent conveyance under § 275, a plaintiff must prove (1) a

---

[15]     *See In re Adelphia Commc'ns Corp.*, 323 B.R. 345, 386 (Bankr. S.D.N.Y. 2005) (noting that creditors become "stakeholders" once a company is insolvent).

conveyance, (2) lack of fair consideration, and (3) awareness by the transferor that, as result of the conveyance, he will not be able to pay present and future debts." *Cadle Co. v. Lieberman*, 96-CV-0495, 1998 WL 1674549, at *11 (E.D.N.Y. Sept. 11, 1998).

As an initial matter, it is undisputed that a conveyance occurred.

In addition, it is undisputed that Defendant SVI sold PVS's assets to Defendant Panavision at a price that was more than thirty-five percent (35%) higher than the outstanding debt of $1,620,000,[16] which the Lenders (and majority owners of Defendant SVI) forgave in exchange for PVS's assets.[17] Furthermore, although there is some evidence in the record (albeit conclusory) that the Lenders' total investment in Defendant SVI (factoring in the $1,620,000 debt that was forgiven) was $2,136,436.00,[18] this amount is approximately fourteen percent (14%) less than the minimum amount that Defendant SVI received from Defendant Panavision for its assets.[19] In addition, when the potential additional "earn-out" payments are taken into consideration, the Court finds that, even assuming that the Lenders' total investment in Defendant SVI was $2,151,436, Plaintiff has satisfied its burden of establishing that Defendant SVI did not pay fair consideration for PVS's assets.[20] Moreover, in light of the fact that the

---

[16]     Defendant Panavision paid Defendant SVI $2,000,000 in cash, plus *a minimum guarantee* of $500,000 in "earn-out" payments. The Court reaches this conclusion through the following calculations: (1) $1,620,000 minus $500,000 equals $880,000; and (2) $880,000 divided by $2,500,000 equals 0.352.

[17]     The Court notes that forgiving "[a]n antecedent debt can constitute fair consideration." *CIT Group/Commercial Serv., Inc. v. 160-09 Jamaica Ave. Ltd. P'ship*, 25 A.D.3d 301, 303 (N.Y. App. Div., 1st Dept. 2006).

[18]     *See, supra,* note 13 of this Decision and Order.

[19]     The Court reaches this conclusion based on the following calculations: (1) $2,136,436.00 divided by $2,500,000.00 equals 0.8546; and (2) 100% minus 85.46% equals 14.54%.

[20]     *See Petersen v. Vallenzano*, 849 F. Supp. 228, 231 (S.D.N.Y. 1994) (noting that the burden of proving that the conveyance was made without fair consideration is on the creditor).

Lenders and PVS executives were aware of PVS's creditors before transferring PVS's assets to

Defendant SVI (and in fact had internal discussions about "trash[ing]" these creditors,[21] and

selling a "reconstituted PVS" to an identified third party), the Court finds that, even assuming

that Defendant SVI otherwise paid fair value for the PVS assets by forgiving PVS's debt of

$1,620,000,[22] the transaction between PVS, the Lenders and Defendant SVI lacked the requisite

"good faith."[23]

Finally, it is undisputed that, before the transfer was effectuated, PVS had creditors

besides the Lenders, whom PVS did not have the financial ability to pay after the transfer of its

---

[21]     The Court notes that the evidence in the record establishes only that this discussion occurred between members of CVF.

[22]     The Court notes that forgiving "[a]n antecedent debt can constitute fair consideration."  *CIT Group/Commercial Serv., Inc. v. 160-09 Jamaica Ave. Ltd. P'ship*, 25 A.D.3d 301, 303 (N.Y. App. Div., 1st Dept. 2006).

[23]     "The element of 'fair consideration' is not met when the good faith component of [s]ection 272(a) is missing."  *In re Montclair Homes, Inc.*, 200 B.R. 84, 96 (Bankr. E.D.N.Y. 1996) (citing *Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240 [2d Cir. 1987]); *see also In re Skalski*, 257 B.R. 707, 711 (Bankr. W.D.N.Y. 2001) ("[F]air value is not sufficient if bad faith taints the transaction. . . . [T]here must be both good faith and good consideration on the part of the transferee."); *In re Le Café Creme, Ltd.*, 244 B.R. 221, 241 (Bankr. S.D.N.Y. 2000) ("[T]he concept [of fair consideration] has two separate components, the fair equivalency of the consideration given for the debtor's transfer and good faith. . . . Good faith is required of both the transferor and the transferee.").  "[T]he term 'good faith' is not synonymous with the absence of fraudulent intent."  *Amalgamated Bank of New York v. Marsh*, 823 F. Supp. 209, 223 (S.D.N.Y. 1993).  "All that the lack of good faith imports is a failure to deal honestly, fairly and openly." *Amalgamated Bank of New York*, 823 F. Supp. at 223 (internal quotation mark and citation omitted).  "Indeed, a lack of good faith can be established . . . [1] if there has not been an honest belief in the propriety of the activities in question[, 2] . . . if there is intent to take unconscionable advantage of others[, or 3] . . . if there is intent to, or knowledge of the fact that the activities in question will hinder delay, or defraud others."  *Id*. (internal quotation marks and citations omitted); *see also In re Checkmate Stereo and Elec., Ltd.*, 9 B.R. 585, 617 (Bankr. E.D.N.Y. 1981) ("Good faith may be lacking because of a transferee's knowledge of a transferor's unfavorable financial condition at the time of the transfer[.]"), *aff'd*, 21 B.R. 402 (S.D.N.Y. 1982).

assets.[24]  In addition, as noted above, both the Lenders and the PVS stockholders were aware that

PVS would be unable to pay its debts after the transfer of its assets.

As a result, Plaintiff's motion for summary judgment on its claim of successor liability

under a theory of fraudulent conveyance against Defendant SVI is granted on this alternative

ground, and Defendant SVI's motion for summary judgment on this claim is denied on this

alternative ground.[25]

### 2.     Plaintiff's Claim Against Defendant Panavision

It is undisputed that Defendant Panavision had knowledge of Plaintiff's breach-of-

contract claim against PVS before Defendant SVI's assets (which included PVS's assets) were

transferred to Defendant Panavision on December 15, 2003.  The Court reaches this conclusion

based on the following undisputed material facts: (1) on July 8, 2003, Plaintiff filed a demand for

arbitration regarding PVS's alleged breach of contract; and (2) on October 21 and 22, 2003, Eric

Golden, then Senior Vice President of Panavision, along with Panavision's attorneys, conducted

a thorough due diligence of Defendant SVI's assets, during which time Panavision received

---

[24]     (Dkt. No. 165, Rule 7.1 Response, at ¶ 89 [stating that "PVS's ordinary business was terminated upon transfer of its assets, leaving nothing to continue"]; *see also* Dkt. No. 165, Rule 7.1 Response, at ¶ 109 [stating that "that PVS lost its assets through foreclosure to the Lenders"].)

[25]     The Court notes that, in footnote 2 in its memorandum of law in support of its motion for summary judgment, Defendant SVI states as follows: "SVI continues to exist as an actively-registered company only because of this lawsuit, which has extended its winding up period.  But for this case, the earn-out payments would have been distributed and SVI would have been dissolved years ago."  (Dkt. No. 114.)  The Court assumes that this representation (made on April 7, 2011) is still accurate as of the date of this Decision and Order, and will continue to be accurate until (1) it is determined by the appropriate court precisely how much money (a) the Lenders invested in Defendant SVI, and (b) Defendant SVI made from the sale of its assets to Defendant Panavision, and (2) Plaintiff calls upon Defendant SVI to pay Plaintiff the difference between these amount.  The Court would add only that, in the event that this is not the case, and Plaintiff chooses to recommence an action in this District based on that fact, Plaintiff is advised to designate that action as "related" to the current action, so that that action will be properly assigned to the undersigned.

documents related to the foreclosure of PVS, Plaintiff, and the arbitration proceeding between Plaintiff and PVS.

However, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that, as result of Defendant SVI's sale and transfer of assets to Defendant Panavision, Defendant SVI would not be able to pay its present and future debts.  To the contrary, a rational factfinder could, based on the evidence in the record, conclude only that Defendant SVI would be able to pay its present and future debts.  Thus, Plaintiff has failed to establish *constructive* fraud.

In addition, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that badges of fraud existed with regard to Defendant Panavision's acquisition of Defendant SVI (i.e., that Defendant Panavision paid $2,000,000 in cash plus guaranteed an additional minimum of $500,000 in "earn-outs" for the purpose of defrauding any present or future creditors of Defendant SVI).  For example, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Panavision did not pay adequate consideration for Defendant SVI's assets.  Thus, Plaintiff has failed to establish *actual* fraud.

For these reasons, Plaintiff's motion for summary judgment on its claim of successor liability under a theory of fraudulent conveyance against Defendant Panavision is denied, and Defendant Panavision's motion for summary judgment on this claim is granted.

### C.   Defendant SVI's Remaining Arguments in Support of Its Motion

As stated above in Part I.D.3. of this Decision and Order, Defendant SVI argues that its motion should be granted (and Plaintiff's motion should be denied) on public policy grounds.  More specifically, Defendant SVI argues that Plaintiff should not be granted summary judgment

because the effect would be twofold: (1) it would permit Plaintiff to recover from Defendant SVI $3,000,000, plus interest, or roughly $2,000,000 more than Defendant SVI profited from the asset sale to Defendant Panavision, essentially permitting Plaintiff to receive twice as much as either Defendant SVI or Defendant Panavision paid for the PVS assets; and (2) it would permit Plaintiff to recover this amount "ahead of every party that had a superior claim to th[e PVS] assets prior to the foreclosure. . . ."

As an initial matter, the Court finds that Plaintiff may recover from Defendant SVI, at best, only what money Defendant SVI received in excess of (1) the debt held by the Lenders (i.e., $1,620,000), and (2) the $516,436.00 in additional money invested by the Lenders in Defendant SVI.  This is because an unsecured creditor such as Plaintiff may not collect more than it would have been able to collect had the PVS asset transfer never occurred.  *See Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 133 (N.Y. App. Div., 2 Dept. 1986) ("The creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance; the limited remedies explicitly permitted under the statute confirm this interpretation.  The imposition of a constructive trust upon the transferee would provide the plaintiff with an equitable interest in the property which could not have been achieved solely by entering the judgment, even in the absence of a conveyance.").[26]

---

[26]     *See also Travelers Ins. Co. v. 633 Third Assoc.*, 973 F.2d 82, 87 (2d Cir. 1992) ("*Murkoff* stands for the proposition that a judgment creditor does not gain new rights in property by means of a fraudulent conveyance action. Nothing in our opinion today contradicts this principle. A secured creditor, such as Travelers, is similarly barred from using the fraudulent conveyance action as a means to expand its interests in property. Like the creditor in *Murkoff*, its remedy is 'limited to reaching the property which would have been available . . . had there been no conveyance.'") [quoting *Murkoff*, 120 A.D.2d at 133].

In addition, while the Court agrees that it may be problematic for Plaintiff to recover the amount of its judgment ahead of one or more other claimants that had a "superior claim" to the PVS assets before the foreclosure, those creditors are not parties to the proceeding, and there is no motion pending before the Court regarding those creditors (nor has the Court been made aware of the identity of all of the creditors and what each of their claims were).  The Court would add only that Defendant SVI's implicit solution to this problem (i.e., that the Court should find no successor liability and permit Defendant SVI to retain this money, in order to avoid inequity to other creditors who have an interest in this money superior to Plaintiff) is a solution only to the benefit of Defendant SVI, and not to Plaintiff (or any of the other creditors, because Defendant SVI would be able to rely on that "solution" with regard to their claims as well).

For these reasons, the Court rejects Defendant SVI's argument that its motion for summary judgment should be granted (and Plaintiff's motion should be denied) on public policy grounds.

### D.      Plaintiff's Motion to Dismiss Defendants' Affirmative Defense/Counterclaim

As stated above in Part I.B. of this Decision and Order, in their jointly-filed Answer, Defendants assert one affirmative defense/counterclaim to set aside the default arbitration award, "re-open" the arbitration, and permit any Defendant having successor liability for the default arbitration award the right to interpose a re-hearing of the arbitration, and present all available defenses, claims and counterclaims.  (Dkt. No. 17.)

### 1.      Plaintiff's Motion Against Defendant Panavision

Because the Court has dismissed Plaintiff's claim of successor liability against Defendant Panavision, Plaintiff's motion to dismiss Defendant Panavision's affirmative defense/counterclaim (which depends on the success of Plaintiff's underlying claim against Defendant Panavision) is denied as moot.

###### 2.      Plaintiff's Motion Against Defendant SVI

In support of its motion to dismiss its affirmative defense and/or counterclaim, Plaintiff

argues that the affirmative defense and/or counterclaim is (1) meritless, (2) barred by the statute

of limitations, and (3) barred by the doctrines of collateral estoppel and *res judicata*.  (Dkt. No.

110.)  Based on the current record, the Court accepts Plaintiff's argument.

As an initial matter, because the Court has found Defendant SVI liable to Plaintiff as a

successor in interest to PVS (under three independent theories of successor liability), the Court

finds that Defendant SVI is liable for the arbitration award against PVS (subject to the

limitations set forth in Part III.C. of this Decision and Order).  *See, e.g., Miler*, 2005 WL 267551,

at *13-14 (imposing successor liability on defendant, and finding defendant liable for plaintiff's

judgment against corporate entity with whom defendant had "*de facto*" merged); *Allen Morris*

*Commercial Real Estate Serv. Co.*, 1993 WL 183771, at *7 (finding defendant liable to plaintiff

for judgment plaintiff received against predecessor corporation after corporation was acquired by

defendant, based on successor liability).  Thus, Plaintiff need not commence a new arbitration

action against Defendant SVI in order to recover from Defendant SVI money owed by PVS.[27]

In addition, because more than five years have passed since a court confirmed Plaintiff's

arbitration award,[28] Defendant SVI, who was notified of the award, at the latest, on March 14,

2005 (i.e., the date Plaintiff filed this action in Wayne County Circuit Court, seeking to hold

Defendant SVI and Defendant Panavision liable for the judgment it obtained against PVS under

the theory of corporate successor liability), may no longer move to vacate the arbitration award

---

[27]      The fact that PVS did not appear in arbitration, and thus did not dispute the merits of Plaintiff's claim, has no bearing on the enforceability of the arbitration award.

[28]      The Court notes that Plaintiff's motion to confirm its arbitration award against PVS was granted on March 15, 2005.  (Dkt. No. 161, Exh. 79.)

against PVS. *See* N.Y. C.P.L.R. § 7511(a) ("An application to vacate or modify an award may be made by a party within ninety days after its delivery to him.").[29]

Finally, as Plaintiff correctly points out in its motion papers, the statute of limitations on the breach-of-contract dispute between Plaintiff and PVS is six years from the date of the breach.[30]  Assuming that Plaintiff breached its agreement with PVS by unlawfully terminating the agreement on April 17, 2002, the statute of limitations for asserting such a claim expired on April 17, 2008 (i.e., more than three years ago).  As a result, Defendant SVI is precluded from asserting a breach-of-contract counterclaim against Plaintiff based on Plaintiff's termination of its agreement with PVS.

The Court would add only that Defendant SVI had a full and fair opportunity to present defenses and counterclaims against Plaintiff in the arbitration action, which Plaintiff originally filed against it (as well as PVS).  Defendant SVI instead chose to threaten Plaintiff with litigation if Plaintiff did not discontinue arbitration against it.  In addition, Defendant SVI had an opportunity, in this action, to present a defense that it should not be liable for the arbitration award because it was not a successor of PVS.  Thus, Defendant SVI cannot reasonably be heard now to complain that, although it is a successor to PVS, an award against PVS should not be

---

[29]     *Cf. Brentnall v. Nationwide Mut. Ins. Co.*, 598 N.Y.S.2d 315, 316 (N.Y. App. Div., 2d Dept. 1993) (noting that, although statute requires that application to vacate or modify arbitration award be made 90 days after delivery of the award, a party may wait and make its arguments for vacating or modifying award in opposition to motion to confirm award); *Fabiano v. Country-Wide Ins. Co.*, 540 N.Y.S.2d 864, 865 (N.Y. App. Div., 2d Dept. 1989) (finding that proceeding seeking to vacate award of master arbitrator, which was not commenced until almost one year following issuance of master arbitrator's award, was barred as untimely); *Classic-Togs, Inc. v. Joint Md. of Cloak, Suit, Skirt, and Reefer Makers' Union,* 211 N.Y.S.2d 653, 654 (N.Y.S. Sup. Ct., New York Co., 1961) (holding that timely motion by successor in interest to vacate arbitration award was without merit, in part because successor in interest could have moved to set aside notice of arbitration or to withdraw from arbitration).

[30]     *See* N.Y. C.P.L.R. § 213(2).

binding against it.

For all of these reasons, Plaintiff's motion to dismiss Defendant SVI's affirmative defense and/or counterclaim is granted.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 134) is **GRANTED in part and DENIED in part** in the following respects:

(1) Plaintiff's motion for summary judgment against Defendant SVI is **GRANTED**; and

(2) Plaintiff's motion for summary judgment against Defendant Panavision is **DENIED**; and it is further

**ORDERED** that Defendant SVI's motion for summary judgment (Dkt. No. 114) is **DENIED**; and it is further

**ORDERED** that Defendant Panavision's motion for summary judgment (Dkt. No. 111) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's motion to dismiss Defendants' affirmative defenses/counterclaims (Dkt. No. 110) is **GRANTED in part** and **DENIED in part** in the following respects:

(1) Plaintiff's motion against Defendant Panavision is **DENIED** as moot; and

(2) Plaintiff's motion against Defendant SVI is **GRANTED**; and it is further

**ORDERED** that, as a result of the foregoing, Plaintiff's request for a judgment declaring the rights of the parties with regard to the successor liability of Defendants (Dkt. No. 2, Attach. 1, at 8-15 [Plf.'s Compl.]) is **GRANTED in part** and **DENIED in part** in the following respects:

35

(1) Plaintiff's request for a judgment declaring that Defendant SVI is liable, as the

successor, for an arbitration award granted against PVS in favor of Plaintiff in the

amount of $2,870,897.43 plus interest is **GRANTED** to the extent this amount

does not exceed the difference between the amount of money the Lenders

invested in Defendant SVI, and the amount of money Defendant SVI made from

the sale of its assets to Defendant Panavision, and is otherwise **DENIED**; and it is

further

(2) Plaintiff's request for a judgment declaring that Defendant Panavision is

liable, as the successor, for an arbitration award granted against PVS in favor of

Plaintiff in the amount of $2,870,897.43 plus interest is **DENIED**; and it is further

**ORDERED** that this action is **CLOSED** **without prejudice** to the right of the parties to

secure reinstatement of the case within thirty (30) days after the date of the judgment by making

a showing that any claim remains in this action over which the Court has jurisdiction; and in the

event that no request is made for reinstatement within thirty (30) days of the date of this

judgment, the closure of this case shall thereafter be **with prejudice**.  The clerk is directed to

enter judgment and close this case.

Dated: September 30, 2011
         Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge

36